United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JACQUELINE RAMOS, A/K/A JACKIE ACOSTA,<br><br>Defendant. | Case No. 17-CR-00379-LHK-2<br><br>**ORDER GRANTING COMPASSIONATE RELEASE**<br><br>Re: Dkt. No. 154 |

Defendant Jacqueline Ramos, also known as Jackie Acosta ("Defendant"), is currently in the custody of the Bureau of Prisons at the Federal Correctional Institution in Dublin, California ("FCI Dublin"). Defendant moves for a reduction of her sentence pursuant to 18 U.S.C. § 3582(c)(1)(A), which is also known as compassionate release. ECF No. 154 ("Mot."). For the reasons set forth below, the Court GRANTS Defendant's motion for compassionate release.

**I.   BACKGROUND**

Defendant pled guilty to one count of conspiracy to file false claims in violation of 18 U.S.C. § 286 (Count One) and two counts of bank fraud in violation of 18 U.S.C. § 1344(2) (Counts Two and Three). Judgment at 1, ECF No. 118. Defendant, who was a certified tax preparer, certified notary public, and licensed insurance broker, led a scheme that submitted 2,883

1
Case No. 17-CR-00379-LHK-2
ORDER GRANTING COMPASSIONATE RELEASE

tax returns requesting fraudulent refunds from the Internal Revenue Service ("IRS"). U.S. Sentencing Memo. at 11, ECF No. 103; Presentence Investigation Report ("PSR") ¶ 70, ECF No. 99. The scheme spanned at least 2011 and 2012 and involved four co-defendants. *See* Sentencing Memo. at 7; PSR at 2.

To confirm that the scheme's 2,883 tax returns were fraudulent, the government sampled 375 of the tax returns and found that all 375 fraudulently sought a total of $1,641,610 in refunds. *Id.* at 12. Because the 375 sampled tax returns were all fraudulent, the government estimated that all 2,883 tax returns submitted by Defendant's scheme were fraudulent. *Id.* at 15. Those 2,883 tax returns requested $11.8 million in refunds and resulted in $9.3 million in refunds. *Id.* at 11. Thus, the government concluded that the actual loss to the IRS was $9.3 million. *Id.* at 22.

At sentencing, the Court did not adopt the government's loss calculation of $9.3 million because the Ninth Circuit had not approved sampling as a method to calculate loss amount. *See* Sentencing Tr. at 50:3–18, ECF No. 123 (declining to consider sampling "because there's no law in the Ninth Circuit endorsing the sampling"); *see generally United States v. Yang*, No. 16-CR-00334-LHK, 2020 WL 2793936, at *18 (N.D. Cal. May 29, 2020) ("[T]he rule of lenity [] 'requires ambiguous criminal laws to be interpreted in favor of the defendants subjected to them.'" (quoting *United States v. Miller*, 734 F.3d 530, 542 (6th Cir. 2013))). Thus, the Court adopted $1,641,610 as the loss amount—the total tax refund sought by the 375 tax returns that the government had analyzed and determined were fraudulent. *Id.* at 58:24.

The Court sentenced Defendant to 60 months in custody, which was within Defendant's Sentencing Guidelines range of 57 to 71 months, and three years of supervised release. Judgment at 1–2. Defendant self-surrendered on May 29, 2019. *Id.* at 2. Defendant will have served 19.1 months if she is released to home detention in 14 days. Assuming Defendant qualifies for good time credits, Defendant's projected release date is August 31, 2023. *See* Federal Bureau of Prisons, *Find an Inmate*, https://www.bop.gov/inmateloc/ (last visited Dec. 9, 2020) (search for Register Number 24369-111). Thus, as of Defendant's expected release date, Defendant will have served 32% of her sentence. Assuming good time credits, Defendant has served about 37% of her

sentence.

In the instant motion, Defendant asks that the Court "resentence her to time served followed by six years of supervised release with a condition of home confinement to August 31, 2023." Mot. at 13.

## II. LEGAL STANDARD

18 U.S.C. § 3582(c) allows a court to modify a defendant's "term of imprisonment . . . upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant." A defendant may bring a § 3582(c) motion after he has "fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons" to bring the motion on his behalf, or after "the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A).

"[A]fter considering the factors set forth in § 3553(a) to the extent applicable," a court may grant compassionate release in two circumstances. As relevant here, a court may reduce a defendant's sentence and thereby release a defendant if the court finds "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." *Id.* § 3582(c)(1)(A). The relevant Sentencing Commission policy statement enumerates several "extraordinary and compelling reasons." U.S. Sentencing Guidelines ("U.S.S.G") § 1B1.13(1)(A) & cmt. 1. A defendant fulfills one of the enumerated reasons when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* § 1B1.13 cmt. 1(A)(ii). The Commission also requires that the defendant not pose a danger to the safety of the community. *Id.* § 1B1.13(2).

## III. DISCUSSION

In analyzing whether a defendant is entitled to compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i), courts determine whether a defendant has satisfied three requirements. First, a

defendant must exhaust her administrative remedies.[1] Second, a defendant must establish that the § 3553(a) sentencing factors "are consistent with" granting a motion for compassionate release. *United States v. Trent*, 2020 WL 1812242, at *2 (N.D. Cal. Apr. 9, 2020). Third, a defendant must demonstrate that "extraordinary and compelling reasons"—as defined by the applicable Sentencing Commission policy statement—"warrant . . . a reduction" of sentence. 18 U.S.C. § 3582(c)(1)(A)(i).

As to the first requirement, exhaustion, the government concedes that Defendant has exhausted her administrative remedies. Opp'n to Mot. ("Opp'n") at 2, ECF No. 158; *see* 18 U.S.C. § 3582(c)(1)(A) (allowing a court to modify a term of imprisonment "upon motion of the defendant after . . . the lapse of 30 days from the receipt of such a request [to bring a motion on defendant's behalf] by the warden of the defendant's facility").

As a result, only the second and third requirements are at issue in the instant case. In its opposition, the government first addresses whether Defendant has demonstrated that extraordinary and compelling reasons warrant compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A) and then addresses § 3553(a) sentencing factors. The Court does the same.

### A. Extraordinary and Compelling Reasons

A court may reduce a defendant's sentence and thereby release a defendant if the court finds "extraordinary and compelling reasons warrant such a reduction" and that "such a reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A). The relevant Sentencing Commission policy statement enumerates several "extraordinary and compelling reasons." U.S.S.G. § 1B1.13(1)(A) & cmt. 1. As mentioned above,

---

[1] Courts disagree as to whether Section 3582's exhaustion requirement is jurisdictional and subject to equitable exceptions. *Compare United States v. Connell*, --- F. Supp. 3d ---, 2020 WL 2315858, at *2-5 (N.D. Cal. May 8, 2020) (finding "Section 3582's exhaustion provision is . . . not jurisdictional" and subject to equitable exceptions), *with United States v. Reid*, 2020 WL 1904598, at *4 (N.D. Cal. Apr. 18, 2020) ("The Court cannot forgive the failure to exhaust, and without exhaustion, the Court lacks jurisdiction over the motion [for compassionate release]."). However, the Court need not reach this issue because Defendant has exhausted her administrative remedies.

a defendant fulfills one of these reasons when the defendant is "suffering from a serious physical or medical condition . . . that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." *Id.* § 1B1.13 cmt. 1(A)(ii). The Commission also requires that the defendant not pose a danger to the safety of the community. *Id.* § 1B1.13(2).

At the time of Defendant's March 20, 2019 sentencing, Defendant was 49 years old. PSR at 3. At the time of sentencing, Defendant took several medications for high blood pressure, anxiety, and depression. PSR ¶¶ 65, 66. Defendant also had a body mass index ("BMI") of 34.5 given her height (5 feet 3 inches) and weight (195 pounds). *Id.* ¶ 64.

In her instant motion, Defendant, who is now 51 years old, asserts that she suffers from type 2 diabetes, hypertension, and high cholesterol. Mot. at 8. The government also candidly notes that "Defendant's BMI may technically put her in the obesity range (defined as BMI greater than 30)." Opp'n at 7. Moreover, the government concedes that "type 2 diabetes and obesity are included in the [Centers for Disease Control] CDC-identified risk factors," so that "Defendant's physical condition does put her at a higher risk of severe illness or death from COVID-19." *Id.*

Specifically, the CDC includes type 2 diabetes and obesity in the category of conditions that put "adults of any age . . . at increased risk of severe illness from the virus that causes COVID-19." CDC, *People with Certain Medical Conditions* (updated Dec. 1, 2020), https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html; *see id.* (defining severe illness "as hospitalization, admission to the ICU, intubation or mechanical ventilation, or death"). The Court will refer to this category as the "increased risk" category for short. Other conditions, such as hypertension, are in the category of conditions that "might" put "adults of any age . . . at an increased risk of severe illness from the virus that causes COVID-19." *Id.* The Court will refer to this category as the "might increase risk" category for short. Thus, Defendant has two conditions in the "increased risk" category and one condition in the "might increase risk" category.

Even so, the government argues that Defendant's medical conditions do not constitute

"extraordinary and compelling" reasons for compassionate release. Opp'n at 8 (quoting 18 U.S.C. § 3582(c)(1)(A)). The government's position hinges on three points. None is persuasive.

First, the government asserts that Defendant's hypertension is merely "essential hypertension," which unlike pulmonary hypertension "is not listed in the CDC-identified risk factors for COVID-19." Opp'n at 7. The CDC's latest guidance contravenes the government's assertion. The CDC in fact lists "[h]ypertension or high blood pressure" in the "might increase risk category." CDC, *supra*. Pulmonary hypertension, by contrast, is listed in the "increased risk" category. *Id.* (under the header "Heart Conditions and Other Cardiovascular and Cerebrovascular Diseases"). Thus, even essential hypertension is a CDC-listed risk factor.

Second, the government argues that Defendant cites inapposite cases that "involved defendants with more dire health conditions than Defendant." Opp'n at 8. The Court disagrees for two reasons. To start, it is unclear whether those other defendants were truly in more dire straits. For instance, the government discusses the defendant in *United States v. Simpson*, No. 11-CR-00832-SI-3, 2020 WL 2323055 (N.D. Cal. May 11, 2020), a case where the court found extraordinary and compelling reasons to release defendant based on defendant's health. *See* Opp'n at 8. The *Simpson* Court reasoned that defendant was 62 years old and suffered from asthma (of unspecified severity) and diabetes (of unspecified type). *Simpson*, 2020 WL 2323055, at *1; *see id.* at n.3 (specifically noting diabetes). Asthma is not a CDC-identified risk factor if it is not moderate or severe; and type 1 diabetes is in the "might increase risk" category of conditions. CDC, *supra*. Here, by contrast, Defendant has two conditions in the "increased risk" category (obesity and type 2 diabetes) and one condition in the "might increase risk" category (hypertension).

Moreover, courts have found extraordinary and compelling reasons to release even healthier defendants. In *United States v. Rountree*, for instance, the court found that "Rountree's diabetes and hypertension, in the face of the COVID-19 pandemic, satisfies either § 1B1.13's specific 'medical condition' provision or its 'catchall' provision" of other extraordinary and compelling reasons. 460 F. Supp. 3d 224, 235 (N.D.N.Y. 2020) (collecting cases). Unlike

6
Case No. 17-CR-00379-LHK-2
ORDER GRANTING COMPASSIONATE RELEASE

Defendant here, there is no indication Rountree suffered from another condition in the "increased risk" category such as obesity. Nor was Rountree in a much riskier age group than Defendant. *See generally* CDC, *COVID-19 Hospitalization and Death by Age* (Aug. 18, 2020), https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-death-by-age.html. Rather, Rountree was 56 years old—only five years older than Defendant. *See* Mot. Requesting Transfer to Home Confinement at 4, *Rountree*, 12-CR-0308 (Apr. 20, 2020), ECF No. 175. Similarly, in *United States v. Williams-Bethea*, the court found extraordinary and compelling reasons to release a 50-year-old woman suffering from hypertension and obesity. 464 F. Supp. 3d 562, 567 (S.D.N.Y. 2020).

The government's last point against the presence of "extraordinary and compelling reasons" is that Defendant's current facility, FCI Dublin, has not been "significantly impacted by COVID-19." Opp'n at 8. Specifically, the government asserts that as of the date of its opposition, FCI Dublin had "only one known case of an inmate testing positive for COVID-19 (since recovered), and zero COVID-19 related deaths across an inmate population of more than 800." *Id.* at 9. The government concludes that "the risk of contracting COVID-19 is several times higher in Monterey County"—the county where Defendant would be released—"than it is in FCI Dublin." *Id.*

The Court also disagrees with this last point for two reasons. For one, across 874 inmates, FCI Dublin now has six inmates currently testing positive for COVID-19. However, the Court notes that zero staff at FCI Dublin are currently testing positive for COVID-19. Moreover, for the duration of the pandemic, FCI Dublin has had zero inmate or staff deaths, and has 15 inmates and six staff who have recovered from COVID-19. *See* Bureau of Prisons, *COVID-19 Cases*, https://www.bop.gov/coronavirus/index.jsp (last visited Dec. 9, 2020); Bureau of Prisons, *FCI Dublin*, https://www.bop.gov/locations/institutions/dub/ (last visited Dec. 9, 2020).

For another, comparing positivity rates in prison to positivity rates in the general public understates the risk of contagion in prison. The *Rountree* and *Williams-Bethea* courts, for example, granted compassionate release from federal facilities with *zero* confirmed cases of

7

Case No. 17-CR-00379-LHK-2
ORDER GRANTING COMPASSIONATE RELEASE

COVID-19. *See Rountree*, 460 F. Supp. 3d at 236 ("zero positive tests"); *Williams-Bethea*, 464 F. Supp. 3d at 569 ("zero positive cases"). Many other courts have also noted the realities that incarceration prevents imprisoned defendants from engaging in practices that reduce the risk of contracting COVID-19. *See, e.g., United States v. Lucas,* 2020 WL 2059735, at *3 (W.D.N.Y. Apr. 29, 2020) (noting that the "conditions [at FCI Morgantown] make the social distancing required to minimize the risk of contracting COVID-19 nearly impossible" and that this "is not surprising given the challenges social distancing presents in a prison or any facility with many residents"); *Trent*, 2020 WL 1812242, at *2 ("Confined to a small cell where social distancing is impossible, Trent cannot provide self-care because he cannot protect himself from the spread of a dangerous and highly contagious virus." (alterations omitted) (quoting *United States v. Perez*, --- F. Supp. 3d ---, 2020 WL 1546422, at *4 (S.D.N.Y. Apr. 1, 2020))). Put simply, "[a]dequately caring for someone with underlying health conditions like [Defendant's] entails reducing that individual's risk of exposure to COVID-19; keeping [Defendant] [incarcerated] is not the 'most effective manner' of mitigating that risk." *Connell*, 2020 WL 2315858, at *6.

Accordingly, because of Defendant's Type 2 diabetes, obesity, and hypertension, the Court finds that Defendant has demonstrated extraordinary and compelling reasons that warrant compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

### B. Section 3553(a) Sentencing Factors

The statute governing motions for compassionate release, 18 U.S.C. § 3581(c)(1)(A), requires that courts also "consider[] the factors set forth in section 3553(a)." Those factors include, among other things, the nature and circumstances of the offense and the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed medical care in the most effective manner; and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. 18 U.S.C. § 3553(a).

Here, the government argues that granting Defendant's motion would undermine the § 3553(a) factors in two ways. First, the government correctly notes that Defendant's crime was serious: she led a scheme that defrauded taxpayers of over $1.6 million. Opp'n at 2, 10. Second, the government argues that releasing Defendant would result in Defendant receiving a more lenient sentence than two of three less culpable co-defendants. *Id.* One defendant, Norma Morfin, received a 30-month sentence; another, Antonio Ahumada Rivas, received a 21-month sentence. *Id.* at 10–11. The third defendant, Ana Bajo, received a 14-month sentence. Opp'n at 10. If Defendant is released within 14 days, she will have served 19.1 months of a 60-month sentence.

The government raises valid points. On balance, however, the § 3553(a) factors weigh in favor of granting Defendant's motion for compassionate release. Three factors are especially relevant here.

First, courts must "consider . . . the need for the sentence imposed . . . to provide the defendant with needed . . . medical care . . . in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). As courts have concluded, defendants are "unlikely to be able to get the medical care [they] need[] [while imprisoned] in the midst of the pandemic." *Connell*, 2020 WL 2315858, at *6. The Court has already discussed above how Defendant's Type 2 diabetes, obesity, and hypertension constitute extraordinary and compelling reasons that warrant compassionate release.

Second, Defendant's continued incarceration is likely not needed "to protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). The government does not dispute that Defendant is not a danger to the community even though her crimes were serious. *Compare* Mot. at 10 (arguing Defendant "is not a danger"), *with* Opp'n at 3 (noting that courts deny compassionate release when defendants are dangerous, but not arguing that Defendant is herself dangerous). Indeed, Defendant has received the minimum risk score from the government's own risk assessment tool, Prisoner Assessment Tool Targeting Estimated Risk and Needs ("PATTERN"). Mot. at 10. Confirming Defendant's lower risk profile are that Defendant (1) had a criminal history score of one and was in criminal history category I at the time of sentencing; (2) has not engaged in misconduct while in custody; and (3) committed non-violent

crimes that entailed submitting fake tax returns to the IRS. PSR ¶ 49; Opp'n at 2.

Lastly, Defendant's continued incarceration would fail "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). Rather, given Defendant's significantly heightened risk of serious illness or death from COVID-19 and the current severity of the pandemic, Defendant's continued incarceration would be a disproportionate punishment for her admittedly serious non-violent crimes. In fact, other courts have granted compassionate release to defendants who were perhaps more culpable than Defendant. *See Rountree*, 460 F. Supp. 3d at 239 (releasing "career offender" with two prior felony convictions, a parole violation, and a violation of terms of release).

Accordingly, the Court concludes that the § 3553(a) sentencing factors weigh in favor of granting Defendant's motion for compassionate release.

## IV. CONCLUSION

For the foregoing reasons, the Court GRANTS Defendant's motion for compassionate release. This order is stayed for up to 14 days to make appropriate travel arrangements and to ensure Defendant's safe release. Defendant shall be released as soon as appropriate travel arrangements are made and it is safe for Defendant to travel. There shall be no delay in ensuring travel arrangements are made. If more than 14 days are needed to make appropriate travel arrangements and ensure Defendant's safe release, then the parties shall immediately notify the Court and show cause why the stay should be extended.

Upon release from imprisonment, Defendant shall be placed on supervised release for a term of five years. This term consists of three years for Count One and five years for Count Two and Three, with all terms to run concurrently.[2] Defendant's supervised release shall have the same conditions as those imposed at Defendant's March 20, 2019 sentencing, with the additional

---

[2] Although Defendant requests six years of supervised release, the Court cannot impose more than five years of supervised release. *See* 18 U.S.C. § 3583(b)(1) ("not more than five years" for a Class A or Class B felony); *id.* § 3624(e) (providing that supervised release "runs concurrently with any Federal, State, or local term of probation or supervised release"); *United States v. Danser*, 270 F.3d 451, 454 (7th Cir. 2001) (citing cases).

10
Case No. 17-CR-00379-LHK-2
ORDER GRANTING COMPASSIONATE RELEASE

condition of home detention for the remaining portion of Defendant's original term of imprisonment (as calculated by the Bureau of Prisons). During the Defendant's term of home detention, Defendant shall participate in the Location Monitoring Program as directed by the probation officer, and be monitored by location monitoring technology at the discretion of the probation officer. Location monitoring shall be utilized to verify Defendant's compliance with home detention while on the Location Monitoring Program. Defendant shall be restricted to Defendant's residence at all times except for medical necessities, court appearances, or other activities specifically approved by the probation officer. Defendant shall pay all the costs of Defendant's participation in the Location Monitoring Program. For the first 14 days after Defendant's release from imprisonment into home detention, Defendant shall self-isolate to prevent the spread of COVID-19.

**IT IS SO ORDERED.**

Dated: December 9, 2020

_____
LUCY H. KOH
United States District Judge